IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAFAEL PADILLA,<br><br>                Petitioner,<br><br>     vs.<br><br>CLARK E. DUCART, Warden, Pelican Bay State Prison,[1]<br><br>                Respondent. | No. 2:12-cv-00238-JKS<br><br>MEMORANDUM DECISION |

Rafael Padilla, a state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Padilla is currently in the custody of the California Department of Corrections and Rehabilitation and is incarcerated at Pelican Bay State Prison. Respondent has answered, and Padilla has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

In resolving his claims on direct appeal, the Court of Appeal recounted the facts of this case as follows:

> In the early hours of April 9, 2005, at a party in a Stockton residence, [Padilla] fired a gun at the chest of victim Cesar Prado, as Prado sat on a couch playing a video game. Prado sustained bullet wounds to the chest and abdomen. At the scene, Prado told police he did not know the shooter or the reason for the shooting.
> At trial, Prado (who was in custody on a narcotics charge) testified he did not remember the shooting or his prior statements about it. He refused to look at police reports to try to refresh his recollection.
> Police officers testified Prado made a statement a couple of weeks after the shooting, in which he said that about a month before the shooting, the shooter ([Padilla]) approached Prado and his cousin on the street, in the area of 12th Street, and asked if

---

      [1]     Clark E. Ducart, Warden, Pelican Bay State Prison, is substituted for G. Lewis, former Warden. FED. R. CIV. P. 25(d).

they were "scraps" (the Norteno gang's derogatory term for rival Sureno gang members). They said no. [Padilla] hit Prado in the shoulder. Prado hit [Padilla] several times in the face before others broke up the fight. Prado next saw [Padilla] at the April 9 party. [Padilla] kept staring at Prado and tried to get him to stop playing a video game. Prado told him to wait his turn. [Padilla] left but returned and asked, "Do you remember me?" Prado said no. [Padilla] said, "You should remember because you were talking shit about me last week," and "You'll remember me now." [Padilla] pulled a gun from his waistband, pointed and shot Prado once in the chest area, paused, and then fired twice more.

Prado testified at the preliminary hearing consistent with his April 26 statement to the police.

Other witnesses described the shooter to police as a young Hispanic male with long black hair in a ponytail, a large "XIV" tattoo under his eye, and "big, rabbit teeth." An officer recognized the description of [Padilla]. A search of [Padilla's] home revealed red clothing and a drawing which, according to a gang expert, symbolized the Sixth Street Gangsters or SSG, a Norteno gang.

When police later arrested [Padilla], he was wearing a red belt bearing the letter "N" and carrying two loaded guns and a cell phone programmed to show the words "Norteno Villain, Scrapa Killin'" when turned on.

Police officer David Putnam, who testified as an expert on Hispanic gangs, said [Padilla] had several tattoos representing himself as a member of the Norteno street gang, specifically a Norteno Sixth Street Gang member: "XIV" (signifying the 14th letter of the alphabet, N, for Norteno) on his face; a "six" tattoo near his eye for Sixth Street; "Stocktone" above his brow; "Norte" on his right arm; a female with a sombrero bearing the word "Norte" on his neck; one dot on his right cheek and four dots on his left cheek for "14"; the same pattern on his hands; "SIX" on his right hand and "ST" (street) on his left hand; and "SK" for scrap killer on his left ring finger. The tattoos on the face, visible to everyone, are a clear sign that he represents the Norteno gang. Based on the evidence he reviewed, the expert opined [Padilla] is a member of the Sixth Street Gang, a subset of the Norteno gang. When someone with [Padilla's] visible tattoos approaches another person and accuses them of being a "scrap," it is a significant confrontational event.

The expert, who qualified in court as a gang expert on at least 25 prior occasions, testified he participated in several hundred investigations of gang-related crimes and hundreds of arrests. He is familiar with the Norteno criminal street gang in Stockton from personal contact with its members, investigations leading to arrests, investigations when Nortenos were victims of crimes, consensual contacts on the street, car stops, and probation and parole searches. The Norteno gang has subsets identified by geographical location in the city, but "generally the blanket, the overall Norteno is what everybody would claim, if you are a Norteno. . . . Realistically, they are all Nortenos. The expert testified he is also familiar with the Norteno subset, the Sixth Street Gang, and has read police reports about them, though he has not had frequent contact with them.

The expert opined, based on personal experience in the arrest of gangs committing those crimes and crime reports he reviewed, that the gang's primary activities include auto theft, carjacking, attempted murder, and shootings.

> The expert testified to prior convictions of other Sixth Street Gang members: Eduardo Vivero was convicted of auto theft in August 2002, and Alejandro Ceja was convicted of carjacking in January 2005.
> The expert was given a hypothetical using the facts of this case and opined the offense was gang-related. The shooting was revenge for the initial gang-related confrontation in which [Padilla] got the worst of a fistfight, which would mean a loss of respect for him. It is important for gang members to maintain power and instill fear among other gang members and the community in general. Without fear from the community, the gang loses its power. If the community cooperates with the police in prosecuting gang members, it is hard for the gang to maintain control.
> The jury convicted [Padilla] of attempted premeditated murder and assault with a firearm and found true the allegations of personal use and discharge of a firearm causing great bodily injury and participation in, and commission of the offenses for the benefit of, a criminal street gang.
> On September 22, 2008, the trial court sentenced [Padilla] to a total term of 40 years to life on the attempted murder count, gang enhancement ([California Penal Code] § 186.22, subd. (b)(1)), and personal discharge of a firearm causing great bodily injury (§ 12022.53, subd. (d)). The court stayed sentence on the other counts and enhancements.

*People v. Padilla*, No. C060011, 2010 WL 4132367, at *1-3 (Cal. Ct. App. Oct. 21, 2010).

Padilla filed a counseled appeal, arguing that the trial court erred in denying his *Batson/Wheeler* motion[2] when the prosecutor removed three African-Americans from the jury panel, and there was insufficient evidence that his group was a criminal street gang or that he acted with the intent to benefit the group. The Court of Appeal affirmed Padilla's judgment of conviction in a reasoned opinion dated October 21, 2010. *Id*. at *12. Padilla raised the same arguments in his counseled petition for review. The California Supreme Court summarily denied review on January 12, 2011.

---

[2] *Batson v. Kentucky*, 476 U.S. 79 (1986) (a shorthand reference to the procedure under which a prosecutor's peremptory strikes of potential jurors are challenged on the basis that the strikes are being made on a discriminatory basis, i.e., because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds); *People v. Wheeler*, 583 P.2d 748 (Cal. 1978) (the California counterpart to *Batson*).

Padilla filed his *pro se* Petition with this Court on November 7, 2012. Respondent concedes that the Petition is timely and that Padilla exhausted his claims in state court.

## II. GROUNDS RAISED

In his Petition before this Court, Padilla raises two claims. First, he argues that the trial court erred in denying his *Batson/Wheeler* motion when the prosecutor removed three African-Americans from the jury panel. Second, he argues that there was insufficient evidence that his group was a criminal street gang and that he acted with the intent to benefit the group.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is "contrary" to federal law "if the state court applies a rule that contradicts the governing law set forth" in controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision," *id.*, and not circuit precedent, *see Renico v. Lett*, 559 U.S. 766, 779 (2010). The holding must also be intended to be binding upon the states; that is, the decision

must be based upon constitutional grounds and not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Thus, where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

In applying these standards in habeas review, this Court reviews this "last reasoned decision" by the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Under AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

IV. DISCUSSION

*Batson/Wheeler* Challenges

Padilla, who is Hispanic, claims that the trial court erred in denying his *Batson/Wheeler* challenge to the prosecutor's removal of three African-American jurors—G., R., and B. Padilla raised this claim in his counseled appeal, and the Court of Appeal recounted the facts of this claim as follows:

> During jury selection, the prosecutor exercised peremptory challenges to excuse one Hispanic (M.), and three Blacks (G., R., and B.). [Padilla] made a *Batson/Wheeler* motion, arguing it appeared the prosecution, having used four of seven peremptory challenges on "people of ethnicity," was "systematically removing all people of color." The trial court declined to find a prima facie case of discrimination against Hispanics because there were "at least four other Hispanic surnamed jurors still . . . in the jury box." The court noted no other Blacks remained, found a prima facie showing of exclusion of Blacks, and asked the prosecutor for her reasons.
> The prosecutor explained G. was "very cagey and guarded" about how she knew one of [Padilla's] attorneys (R. Cingcon) and would only say it was "professional." G.'s

juror questionnaire identified her incarcerated son as a crime victim. She initially said in voir dire that this was an issue, then said it was "no big deal." She failed to answer questions on the questionnaire about willingness to talk with other jurors and about her feelings with respect to lawyers and law enforcement.

With respect to R., the prosecutor disbelieved his denial of gang membership. He admitted he got into gang fights; his residence was subjected to gang graffiti and vandalism. The prosecutor noted (and the trial court agreed, over defense counsel's reservation) that the new trend is for gang members to deny gang membership.

As to B., the prosecutor said he did not appear to understand some of her questions; he kept making reference to the Bible; he had two incarcerated brothers whom he visits; and his ability to render an independent verdict was questionable, based on his inability to explain going to a gun show other than saying his friend wanted to go.

In response, the defense claimed G.'s questionnaire said she knew Cingcon by reputation only; R. merely expressed knowledge that gangs exist and are territorial; and B. merely said he would get from the Bible the strength to resist pressure from other jurors.

The trial court (1) agreed with the prosecutor that G. was evasive about knowing defense counsel; (2) did not know if R. was a gang member but agreed he made a lot of comments about gangs; and (3) [found] B. "seems a little bit different from other people" sufficient, together with his religious comments, to justify the prosecutor's concern. The court found the peremptory challenges were race-neutral.

*Padilla*, 2010 WL 4132367, at *3.

The Equal Protection Clause prohibits purposeful racial discrimination in the selection of the jury. *Batson*, 476 U.S. at 86. In *Batson*, the Supreme Court outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause: 1) a defendant raising a *Batson* claim must establish a *prima facie* case of discrimination; 2) once a *prima facie* case of discrimination is established, the burden of offering race-neutral reasons for the strikes shifts to the prosecutor; 3) after the prosecutor offers race-neutral reasons, the trial court has the duty to determine if the defendant has established purposeful discrimination. *Paulino v. Harrison*, 542 F.3d 692, 699 (9th Cir. 2008) (citing *Batson*, 476 U.S. at 98).

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" regarding *Batson* claims that "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (quoting *Renico*, 559 U.S. at 773). Under the AEDPA, a federal habeas court may only grant relief "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice v. Collins*, 546 U.S. 333, 338 (2006). This "standard is doubly deferential: unless the state appellate court was objectively unreasonable in concluding that the trial court's credibility determination was supported by substantial evidence, we must uphold it." *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012).

Here the parties do not dispute the state court's conclusion at step one of the *Batson* analysis that Padilla established a *prima facie* case that each peremptory strike was based on race or that the prosecutor produced a race-neutral explanation for dismissing each potential juror at step two. The issue presented in Padilla's Petition is whether the state court's determination at step three, that the prosecutor did not engage in purposeful discrimination, was an unreasonable determination pursuant to 28 U.S.C. § 2254(d)(2) of the facts in light of the evidence presented in the state court proceedings.

The Court of Appeal undertook a lengthy analysis of Padilla's claim before ultimately rejecting it:

> 1. *G.*
> The record supports the trial court's decision as to prospective juror G., who disclosed, "I know one of the attorneys" and identified Cingcon. The record shows:
>
> "THE COURT: Is that a close personal relationship or—
>
> "[G.]: No.

        "THE COURT:—or more than an acquaintance?

        "[G.]: No.  I just know him.

        "THE COURT: Would that affect your ability to be fair?

        "[G.]: No—yeah, no.

        "THE COURT: In other words, can you make a decision based on the evidence and the fact you might be familiar with [ ] Cingcon and set that aside?

        "[G.]: No.  Only thing, I just have a problem.  I have a son who is incarcerated."  She then said it would not make it difficult for her to be fair.

        When the prosecutor later asked how G. knew Cingcon, she said, "He's a lawyer."  When asked if Cingcon was "in employment at that time," she said, "Yes."  When asked if he was involved in her son's case, she said, "No."  When the prosecutor asked about the son's criminal case, G. said, "I didn't think it was fair.  The jury—the jury said that he was guilty," but G. said she could be fair in this case.  The prosecutor elicited answers to questions G. had left blank on her questionnaire.

        On appeal, [Padilla] compares G. with others on the panel.  "[C]omparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination. . . . Thus, evidence of comparative juror analysis must be considered in the trial court and even for the first time on appeal if relied upon by the defendant and the record is adequate to permit the urged comparisons."  However, "comparative juror evidence is most effectively considered in the trial court where the defendant can make an inclusive record, where the prosecutor can respond to the alleged similarities, and where the trial court can evaluate those arguments based on what it has seen and heard. . . . Defendants who wait until appeal to argue comparative juror analysis must be mindful that such evidence will be considered in view of the deference accorded the trial court's ultimate finding of no discriminatory intent. [Citation.] Additionally, appellate review is necessarily circumscribed.  The reviewing court need not consider responses by stricken panelists or seated jurors other than those identified by the defendant in the claim of disparate treatment. Further, the trial court's finding is reviewed on the record as it stands at the time the *Wheeler/Batson* ruling is made.  If the defendant believes that subsequent events should be considered by the trial court, a renewed objection is required to permit appellate consideration of these subsequent developments."

        Here, [Padilla] did not raise his comparative analysis in the trial court.  On appeal, he argues the prosecutor allowed two persons to be seated as jurors despite knowing a criminal defense attorney and a deputy district attorney.  However, those attorneys were not involved in this case.

[Padilla] complains one of the prosecutor's reasons for excusing G. was the prosecutor's view that she would be unwilling to talk with other jurors, whereas the prosecutor had no similar hesitation in accepting another person ultimately seated as a juror who said she would not feel comfortable discussing her opinions and feelings with 11 strangers, but she would do it.  However, there is no comparison between the juror's natural discomfort with an unfamiliar situation and G.'s evasiveness about knowing defense counsel and belief that her own son was incarcerated due to a jury's mistake.

We reject [Padilla's] assertion that G.'s exclusion was discriminatory when viewed in the totality of the exclusion of all African-Americans.

2. *R.*

[Padilla] claims the trial court's reservation as to whether R. was actually a gang member shows the court did not agree with the prosecutor's factual basis.  We disagree.

Although the trial court said it was not clear that R. was a gang member, the prosecutor was not required to prove he was a gang member, as [Padilla] suggests.  The record supports the trial court's decision that his exclusion was not race-based.  R., a college student, said someone he knew vandalized his house by "tagging" it with "their symbols" or "logos."  He did not know why.  He did not report it to police out of concern for his family.  He denied being a gang member but had been involved in a "maybe hood kind of thing" and territorial fighting when he lived in East Palo Alto.  If he went into the other side's territory, he would probably be beaten or shot.

The prosecutor was not required to take a chance on R.

3. *B.*

The record supports the trial court's conclusion that B.'s exclusion was not improper.  B. said two younger brothers were involved in a robbery; one is still incarcerated.  He visits but does not talk to them about the robbery.  When the prosecutor asked about his answer on the questionnaire, that he might have difficulty assessing credibility, he said, "Did I say that?" and when told yes but he could change his answer, he said, "I probably wouldn't have no problem with it."  He went to a gun show once because a coworker asked him to go.  He studies the Bible.  The prosecutor asked, "And there are certain tenets within the Bible that govern—like, there must be more [*sic*] two witnesses or more, correct?"  He said yes.  When asked if he could follow the law if it conflicted with his religious beliefs, he said yes.

Insofar as [Padilla] challenges the prosecutor's perception that B. had some type of disability, the trial court was in the best position to assess that perception.  That B. was gainfully employed and had two years of college does not warrant reversal.

[Padilla] claims the prosecutor misrepresented that B. made repeated references to the Bible, whereas it was the prosecutor who kept bringing up the Bible after B. made comments merely indicating "a religious bent."  The point is inconsequential.

On appeal, [Padilla] complains the prosecutor had no problem with another person who was seated as a juror despite having an "obvious strong affiliation with the Bible."  [Padilla] did not raise the point in the trial court.  Moreover, there is no comparison, because the person did not affirmatively and continually inject religion into

> his or her responses, as did B., but merely said, when asked about an apparent tattoo on
> his or her arm, that it was not a tattoo but a "stick on" from "Vacation Bible School" with
> the word "Love." Moreover, the prosecutor's concern was not with religion per se, and
> she had other reasons for excusing B.
>    With reference to B.'s brothers being involved in robbery, [Padilla] complains the
> prosecutor allowed to be seated as jurors several other persons, who were not Black, who
> had prior exposure to criminal matters (a son or friends prosecuted for drunk driving or
> minor convictions, a brother addicted to drugs, and two people who felt discriminated
> against by the police). However, robbery (like the present case) is different because it
> involves a willingness to use violence or a threat of force against another person.
> Moreover, this was not the sole reason for exclusion of B.
>    We conclude [Padilla] fails to show grounds for reversal based on jury selection.

*Padilla*, 2010 WL 4132367, at *4 (citations omitted).

That analysis survives deferential federal habeas scrutiny. The state courts did not unreasonably apply *Batson* or its progeny in exploring and evaluating the prosecutor's conduct. Based on the record before this Court, there is no basis to find that the state court's denial of Padilla's *Batson* claim was unreasonable. Accordingly, Padilla is not entitled to relief on this ground.

<u>Insufficiency of the Evidence</u>

Padilla next argues that insufficient evidence supported the allegation that the shooting was committed with the intent to benefit or promote a criminal street gang. The Court of Appeal denied Padilla relief on this claim as follows:

> II. *Substantial Evidence of Criminal Street Gang*
>    [Padilla] argues the judgment must be reversed because there was insufficient
> evidence that the Sixth Street Gang qualified as a criminal street gang under [California
> Penal Code] section 186.22, in that (1) there was insufficient evidence that the *Sixth
> Street Gang* (as opposed to Nortenos) consistently and repeatedly engaged in the primary
> activities necessary to constitute a criminal street gang, and (2) there was insufficient
> evidence that all Nortenos in Northern California qualified as a criminal street gang. We
> see no ground for reversal.
>    In considering a claim of insufficiency of the evidence, we review the record in
> the light most favorable to the judgment to determine whether it discloses reasonable and
> credible evidence of solid value such that a reasonable trier of fact could find defendant

-10-

guilty beyond a reasonable doubt.  (*Jackson v. Virginia* (1979) 443 U.S. 307, 318; *People v. Johnson* (1980) 26 Cal. 3d 557, 578.)

Although section 186.22 has been amended since the April 2005 shooting to include more categories of predicate crimes not relevant to this case, the pertinent substance of the statute has remained the same.  Thus, section 186.22, subdivision (f), provides: "As used in this chapter, 'criminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in . . . subdivision (e) [including assault with a deadly weapon, auto theft and carjacking], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity."  (Stats. 2001, ch. 854; Stats. 2009, ch. 171, § 1.)  Section 186.22, subdivision (e), provides: "As used in this chapter, 'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons:  [¶] (1) Assault with a deadly weapon or by means of force likely to produce great bodily injury, as defined in Section 245. . . .  [¶] (21) Carjacking, as defined in Section 215. . . . [¶] (25) Theft and unlawful taking or driving of a vehicle, as defined in Section 10851 of the Vehicle Code."

Contrary to [Padilla's] view, the "two or more" predicate offenses do not need to be proven to be gang-related in order to serve as predicate offenses for section 186.22.  (*People v. Gardeley* (1996) 14 Cal. 4th 605, 621.)

Here, police officer David Putnam testified as an expert in Hispanic gangs.  He testified he is familiar with the Norteno gang and with its subset, the Sixth Street Norteno gang.  "Realistically, they are all Nortenos."  He is familiar with the Norteno gang from "[p]ersonal contact with its members; investigations leading to arrests; investigations when Norteno members are victims of crimes themselves; consensual contacts . . . out on the street, car stops, probation, parole searches . . . [and court-ordered interviews]."  He is similarly familiar with but has had less contact with the subset Sixth Street Gangsters, which formed in Stockton in 1990 and had 28 members in September 2006 when the expert was preparing for trial.  Because Sixth Street Gangster[s] are also a Norteno gang, they use the symbol 14 or XIV, N being the 14th letter of the alphabet.  The gang's primary activities include auto theft, carjacking, attempted murder, and shootings.  The expert acquired this information "sometimes from personal experience involved in the arrest of Norteno gang members committing those crimes.  Also with reports coming across my desk at the time in 2005, and a little bit prior to that, with the crimes and the suspects listed and the victims."  The expert opined, the "Sixth Street Norteno" is a criminal street gang under section 186.22, and [Padilla] was a member.

The expert also testified about two specific crimes.  Eduardo Vivero, who was a documented Sixth Street Gangster when the expert did his research in 2006, was

-11-

convicted of auto theft on August 14, 2002. Alejandro Ceja, a validated and documented Sixth Street Gangster, was convicted of carjacking on January 14, 2005.

On cross-examination, the expert opined "Sixth Street Nortenos" is a criminal street gang "[b]ased on my experience with gang members, that our records—first of all, having two convictions is what we legally need. And, second of all, our database, even though we have 28 people and probably 500 Norteno[s], and only 28 Sixth Street Nortenos, that number is probably greater. And the people that claim Sixth Street are also Nortenos. [¶] So if we open this up, his affiliation or those affiliations probably aren't just Sixth Street, they go to Nortenos, they go to the cause. They go to all the Nortenos in Northern California to unite. [¶] So just because I only found two doesn't discount that, in my opinion, those 28 [members] are the 28 we know of, but the hundreds that are—just claim Norteno, that haven't been honest to the police or they have allegiance to Norteno in general, makes me, in my opinion, believe that this is a gang." The expert said, "Sixth Street Nortenos are Nortenos. All the members that are Sixth Street are Nortenos." The expert opined Nortenos are a criminal street gang under section 186.22, based on personal arrests he made of 50 to 100 Nortenos accused of committing one of the enumerated offenses, on average three to six arrests per year over his 13-year career.

[Padilla] argues the evidence revealed only two convictions of Sixth Street Gangsters (August 2002 auto theft and January 2005 carjacking) and [Padilla's] conviction would make a third. [Padilla] argues that, by any stretch of the imagination, three offenses among a purported 28-member gang over a 15 year period cannot constitute consistent and repeated commission of crimes qualifying as primary activities under section 186.22. [Padilla] argues there was even less evidence that all Nortenos qualify as a criminal street gang, because the expert merely said he arrested 50 to 100 Nortenos in his 13-year career, without providing any details when they occurred or whether they involved predicate crimes enumerated in section 186.22.

However, three offenses in 15 years for a small group is not insignificant. Moreover, a specific number of predicate offenses is not the only way to satisfy the statute. "Sufficient proof of the gang's primary activities might consist of evidence that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute. Also sufficient might be expert testimony, as occurred in *Gardeley, supra,* 14 Cal. 4th 605. There, a police gang expert testified that the gang . . . was primarily engaged in the sale of narcotics and witness intimidation, both statutorily enumerated felonies. . . . The gang expert based his opinion on conversations he had with Gardeley and fellow gang members, and on 'his personal investigation of hundreds of crimes committed by gang members,' together with information from colleagues in his own police department and other law enforcement agencies. [Citation.]" (*People v. Sengpadychith* (2001) 26 Cal. 4th 316, 324, italics omitted.)

In *People v. Ortega* (2006) 145 Cal. App. 4th 1344, this court found sufficient evidence to establish Nortenos as a criminal street gang and rejected a defense claim that the term Norteno was merely the geographical identity of a number of local gangs with similar characteristics. (*Id.* at pp. 1355-1356.) The expert testified there were thousands of Nortenos in Sacramento; they used the color red and the symbol XIV; their primary

-12-

activities included murder, assault, carjacking, and other enumerated offenses; members of different gangs worked together to commit crimes; and the expert testified about two gang-related shootings. (*Ibid.*) *Ortega* said that, unlike *People v. Valdez* (1997) 58 Cal. App. 4th 494, which stated Norteno was not the name of a gang (based on expert testimony to that effect), in *Ortega* there was no expert testimony that Norteno is not the name of a gang. (*Ortega, supra,* 145 Cal. App. 4th at p. 1356.)

*People v. Williams* (2008) 167 Cal. App. 4th 983, reversed a section 186.22 conviction because there was no evidence the defendant participated in any group other than the Small Town Peckerwoods (STP) and insufficient evidence of a connection between STP and any other Peckerwood group. (*Id.* at p. 987.) The expert testified the Peckerwoods were a criminal street gang and smaller groups such as STP were factions. However, his conclusion appeared to have been based on commonality of name and ideology, rather than concerted activity or organizational structure. (*Id.* at p. 988.) He said Peckerwoods were not organized like other criminal street gangs; Peckerwoods were looser with less-defined structure. (*Ibid.*) *Williams* said: "Evidence of gang activity and culture need not necessarily be specific to a particular local street gang as opposed to the larger organization. [Citations.] This does not mean, however, that having a similar name is, of itself, sufficient to permit the status or deeds of the larger group to be ascribed to the smaller group." (*Id.* at p. 987.) "[S]omething more than a shared ideology or philosophy, or a name that contains the same word, must be shown before multiple units can be treated as a whole when determining whether a group constitutes a criminal street gang. Instead, some sort of collaborative activities or collective organizational structure must be inferable from the evidence, so that the various groups reasonably can be viewed as parts of the same overall organization." (*Id.* at p. 988.) *Williams* said it would be speculative to infer that the smaller and greater Peckerwood groups shared more than an ideology for section 186.22 purposes, especially because the word "peckerwood" has such an ideological or racial connotation in everyday parlance. (*Id.* at pp. 988-989.)

Here, collaborative activities or collective organizational structure are inferable from the evidence, including the expert testimony about Sixth Street Gang's affiliation as a Norteno subset, and the expert's personal contacts with and review of police records of Nortenos and Sixth Street Gangsters. The expert personally arrested well over 50 and up to 100 Nortenos involved in section 186.22 enumerated offenses, and those incidents were spread out, averaging three to six per year.[FN3] Although subsets label themselves by street name, they do not confine themselves to their street, and it would be common for Sixth Street Gangsters to hang out in other areas of the city. The expert testified Sixth Street Gangsters shared the Nortenos' color (red), symbols (XIV), and commission of section 186.22 enumerated offenses. The affiliation was borne out by [Padilla's] tattoos labeling himself as both a Norteno (XIV) and a Sixth Street Gangster. The evidence sufficed for section 186.22.

> FN3. When the prosecutor later asked about arrests by other officers, the trial court sustained an objection, stating that although the statute requires only

commission of crimes, not convictions, arrests do not necessarily show commission of crime.

[Padilla] cites *In re Alexander L.* (2007) 149 Cal. App. 4th 605, which said "primary activities" in section 186.22 must mean something other than "the occasional commission" of the enumerated crimes, and two crimes were not enough. (*Id.* at p. 613.) However, in *Alexander,* the prosecution relied on the two crimes *plus* the expert's testimony about the gang's other crimes, yet the expert merely testified he "knew" the gang (Varrio Viejo) had been involved in certain crimes; he did not say how he knew. (*Id.* at pp. 611-612.) Here, the expert testified he based his testimony on personal investigations as well as conversations with gang members and review of other police records.

[Padilla] also cites *People v. Perez* (2004) 118 Cal. App. 4th 151, which said evidence of retaliatory shootings of a few individuals over the period of less than a week, together with a beating six years earlier, was insufficient to establish that a group (the Crazy Latin Boys) consistently and repeatedly committed criminal activity under section 186.22. (*Id.* at p. 160.) There, however, the six-year-old incident was outside section 186.22's three year window.

We conclude substantial evidence supports the finding of primary activities establishing a criminal street gang.

III. *Substantial Evidence of Benefit to Gang*

[Padilla] contends there was insufficient evidence that he shot Prado with the specific intent to benefit the gang and promote criminal conduct by the gang, as required to impose the section 186.22 enhancement. We disagree.

Section 186.22, subdivision (b), provides in part that "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished [by specified enhancements]."

[Padilla] argues the *only* evidence was the expert's testimony that the shooter shot as an act of revenge, and revenge was necessary for him to regain respect within the gang and instill fear in the community. [Padilla] says the expert's opinion that this was a revenge shooting "stated nothing beyond the obvious," but it was improper for the expert to opine, based on conjecture, that the shooter intended to regain respect and instill fear. [Padilla] claims there were no facts by which the expert could validly determine whether the shooter was acting on his own behalf or on behalf of a gang.

However, there were such facts in this case—[Padilla's] own words and actions. Thus, [Padilla], wearing visible Norteno and Sixth Street gang tattoos on his face, approached Prado on the street, accused him of being a rival gang member ("scrap"), hit him once, and got hit back by Prado four times before bystanders broke it up. When [Padilla] saw Prado at the party, [Padilla] made reference to the prior encounter by asking

-14-

if Prado remembered him and said, "You'll remember me now" as he pulled out the gun and shot Prado.

[Padilla] says it is improper to allow a gang expert to testify about a gang member's specific intent. (*People v. Ochoa* (2009) 179 Cal. App. 4th 650; *People v. Ramon* (2009) 175 Cal. App. 4th 843; *In re Frank S.* (2006) 141 Cal. App. 4th 1192; *People v. Killebrew* (2002) 103 Cal. App. 4th 644, 651-659.) However, the cited cases held the facts on which the expert based his testimony were insufficient to permit him to construct an opinion about the defendant's specific intent, and the facts did not show the crime was gang-related as opposed to a "frolic and detour" by the individual. *Ochoa* found insufficient evidence that two carjackings were gang-related, where the defendant did not call out gang name, display gang signs, wear gang clothing, or engage in gang graffiti while committing the offenses. In *Ramon,* the defendant and another gang member were caught driving a stolen vehicle with a gun in gang territory, but there were no facts from which the expert could discern they were acting on the gang's behalf at the time, as opposed to acting on their own behalf. In *Frank S.,* there was no evidence that the minor possessed a knife to benefit the gang other than the expert simply informing the judge of her belief of the minor's intent. (*Id.* at p. 1199.) The expert in *Killebrew* testified that individuals in three cars knew there was a gun in two of the cars and jointly possessed the guns for mutual protection. (*Id.* at p. 658.)

Here, in contrast, evidence of specific intent came from [Padilla] himself—his words "remember me" at the time of the shooting, referencing the prior encounter in which [Padilla] accused Prado of being a rival gang member, hit him, and got the worst of it when Prado hit back. The expert merely explained gang culture. The initial gang-related confrontation in which [Padilla] got the worst of a fistfight, would mean a loss of respect for him. It is important for gang members to maintain power and instill fear among other gang members and the community in general. Without fear from the community, the gang loses its power. "[I]t's hard to rule a neighborhood or a block or keep the cops from coming or keep the citizens in general down, if they don't fear those people. If they are called upon and they are testifying and they are working with the police and people are being prosecuted and there is not that fear, then it's hard for them to maintain an area or even a community in general to control."

The federal cases cited by [Padilla] are also distinguishable. Thus, in *Briceno v. Scribner* (9th Cir. 2009) 555 F.3d 1069, the only evidence indicated the defendant and his companion committed robberies on a "frolic and detour" unrelated to the gang, to buy Christmas presents. (*Id.* at pp. 1078, 1081 [federal court granted habeas corpus relief because evidence in state court trial was insufficient to establish specific intent to benefit gang].) *Garcia v. Carey* (9th Cir. 2005) 395 F.3d 1099, held the evidence was insufficient to support a section 186.22 enhancement when the evidence merely showed that a known gang member robbed a victim in an area known to be gang turf, from which a gang expert inferred intent because the gang was "turf-oriented." (*Id.* at pp. 1103-1104.) Aside from gang membership, the record was silent as to what criminal activity of the gang was intended to be furthered by the robbery. (*Ibid.*)

Insofar as these federal cases held that section 186.22 requires proof that the current offense was committed with intent to promote "other" criminal conduct in the

-15-

> future, California courts have disagreed, noting the plain language of section 186.22 requires a showing of specific intent to promote, further, or assist in "any" criminal conduct, not "other" criminal conduct. (*People v. Vasquez* (2009) 178 Cal. App. 4th 347, 353-354; *People v. Hill* (2006) 142 Cal. App. 4th 770, 773-774; *People v. Romero* (2006) 140 Cal. App. 4th 15, 19.)
>     We conclude [Padilla] fails to show grounds to reverse the judgment.

*Padilla*, 2010 WL 4132367, at *7-12.

As articulated by the Supreme Court in *Jackson*, the constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard). This Court must therefore determine whether the California court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson*, 443 U.S. at 318-19. Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the

challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . ."). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted). It is through this lens that this Court must view an insufficiency of the evidence claim.

In this case, Padilla's arguments with regard to his legally insufficiency of the evidence claim are nothing more than an attack on the testimony against him. But this Court is precluded from either re-weighing the evidence or assessing the credibility of witnesses. *Schlup v. Delo*, 513 U.S 298, 330 (1995); *Bruce v. Terhune*, 376 F.3d 950, 957-58 (9th Cir. 2004). Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *Schlup*, 513 U.S. at 330. In this case, there was testimony that Padilla was a member of a criminal street gang and that he committed the felony with the specific intent to benefit or promote that gang. In addition, Padilla's actions and words indicated that he intended to benefit the gang members.

Although it might have been possible to draw a different inference from the evidence and any contradictions in testimony, this Court is required to resolve that conflict in favor of the prosecution. *See Jackson*, 443 U.S. at 326. Padilla bears the burden of establishing by clear and convincing evidence that the state court's upholding of the jury's factual findings against him was erroneous. 28 U.S.C. § 2254(e)(1). He has failed to carry such burden. The record does not

compel the conclusion that no rational trier of fact could have found proof that Padilla was a member of a gang and acted with the intent to benefit that gang, especially considering the double deference owed under *Jackson* and AEDPA. Padilla therefore cannot prevail on this claim either.

## V. CONCLUSION AND ORDER

Padilla is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: December 15, 2014.

                                                     /s/James K. Singleton, Jr.
                                                     JAMES K. SINGLETON, JR.
                                                     Senior United States District Judge